Good morning, guys. I'm just going to use some of this footage that I've got with me today to introduce and consider me as a white guy in the world of medicine. This is me as a 54-year-old man who in 2008 lost his 54-year-old mother to a brain injury because of a condition that I found to serve me for over 18 years. It was a brain injury which was a subsidiary of an injury which is a multinational insurance and investment corporation. In June of 2008, he became diagnosed with a rare type of stage 4 sclerosis. He also received diagnosis of endothelial encephalomyeloma. All of those diagnoses are commonly known in the province of Haiti in confusion and inter-cultural concentrating. In 2008, he turned 19 in 1899, went to court and paid for enhanced blood transfusion and his primary insurance was a disability plan. The plan was issued and insured by a minister of medical life support, another subsidiary of RUG. Within seven days of receiving aid, due to a patient with the injury, he was unable to perform all of the essential duties of his regular in-patient duty prior to the surgery. He was fully disabled until his 15th hour after the surgery. In terms of he became ill, one of his primary agents had been a gastroenterologist. The doctor charged us with specializing in proliferative diseases. So, it was an independent medical review of his condition and requirements. In 2007, there was a creative leader of this research, who was creating a vision. In the vision of the trustee, he announced that the decision to take him in confusion and inter-cultural concentrating caused by the back-to-the-seat paralysis, that he was preventing from being the essential duties of a retired communications chief crack officer, and that therefore it was too easy for him to return to his offices. Then, I finally met with the head of injury honors, Bob, to meet him as a doctor, as a speaker, because Dr. Bliss and Dr. Douglas were both much more concerned about the low ARMS that was discovered on Mr. King's liver in July of 2009. Well, the diagnosis of KD7C is cirrhosis. Dr. Bliss and Dr. Bliss were concerned that Mr. King were, to be, to convey his work into a special environment in which he couldn't be observed. Now, that would be difficult to say. In fact, Dr. Bliss and Dr. Douglas both advised Bob on how we can define the initial consequences of KD7C. Now, the legal question is whether or not, first of all, the district court employed a current standard in reviewing the decision of whether to start, and it seemed fairly clear whether or not we wanted to start the decision once Dr. King was released. Now, in relation to the district court criteria, the district court candidate for injury will I'm sorry, I mean, the standard of the district court is that the district court will apply an abuse of its own standard in the second cases of this one, where the county administrator of a high school is the insurer and the payer of the benefits. Well, you kind of get my point. You can ask the question. Sure. I think you're right. This is a good question. I've seen it quite certainly on the news. It is a problem of competition. So, there's an agency that is reviewing this. It's the Bureau of Health and Human Services. So, there's not a lot of information. I'm not going to get into that. I'm just going to say that we are doing the best we can to be able to focus on the community based on what we see in the box. I'm just going to move it from right here. We're kind of in December. So, I'm just going to move it from right here. And I'm just going to move it from right here. So, what's your response to that? Well, my response to that, Your Honor, is that there is a lot of information that the agency is using. The standard of the court is what I saw in their report. And that's the reason why I'm going to move it from right here. Thank you. Your Honor, it's just that when I read the case, of course, on a computer-based basis, I was concerned for the court. But it seems to me, Your Honor, that they were entitled to some of the information that they were looking for. And that's why I told them that there is a lot of information that they're not just providing about who is using the case. It's not just about people. It's about who is using the case. So, what's your response to that, Your Honor? What's the significance of that case, Your Honor? Well, Your Honor, let's not just say that we found them. We found them. It's not the same. We're a family business. Let them know we are a family business. Never. It would be different if you could stop. If I could at least stand on your assent to those three sentences, Your Honor, HCC, and then say that they're still using the criminal law, we're coming to such a process that you need to be recognized as reasonable. Yes, Your Honor. But if I can't do that, I'm not a lawyer. No. That is incorrect, Your Honor. It is separate. Mr. Reeves said that you have space for people. HCC, that's not your personal claim. Mr. Reeves said that you're going through a process which is unlawful. It's unconstitutional. It seems to me that you need to address this in a way that your lawyer's position is properly defined. It seems to me that you don't have the power to do that. It seems to me that you shouldn't be doing that at all. Yes, Your Honor. It seems to me that while he's doing his work, he knew that he, you know, he knew his position. He came to the court three times. He came to the court three times. He wanted to go back to work and see if he could see where the basis of his client, his client-in-chief, was telling him that he didn't have to go back to work. They were going to fire him. They needed him to be at work or receiving long-term disability payments. Can you show me a number of other statements that you shared in your defense of the topic where you have discovered your client's position was completely unlawful or untoward? Well, in, in February of 2009, Dr. Douglas said that he was going to be remanded to a house for breakfast or to get some of her personal money. His house charged $3.51. And if you read that letter closely, you'll see that Douglas is saying even though he, he has this conviction that the things that he's doing, these things that he's doing for your occupation, it's stressful and dangerous. It's menacing. He's saying that he needs to come back to work because he's concerned about the medical benefits. He needs to come back to work because he's concerned about the medical benefits. He's concerned about how he's being treated. And so, even though I suggest not better judgment, I'm going to allow him to release his work on a monthly basis. But I think he does have the concern that he's stressed upon. The client says that he's sitting on this leave earning over $100,000 a year. He's totally disabled. And he's unable to do the essential duties for his regular work and pay. And that was the case. Did Dr. Douglas, the person who worked with you, the person who's on my list, did he speak to your client? No. Did he address your client's concerns? He did address your client's concerns. He did not hear any of his other questions today? That's correct. And did he separate any of his personal correspondence from the order? And did he make any of his own personal instructions? He never made his own personal instructions. He wrote many letters and emails and he's asked me, what is this leading to? When can you come back? How much will you pay me? And he goes, put it off, put it off, and put it off. As soon as the mandatory, correspondence goes, we're going to send an email 3-7 p.m. Our sustaining liability is 33. Can I ask if you can prompt if it's 2 percent tomorrow? And can you say, if tomorrow it's a fine on any report it should only be tested on Tuesday morning? And the other thing is, as you've seen, he projects a large list of correspondences tomorrow and then at the end of the day OK, this will be proof of theme and the number of posts you wanted to include. Your honor, he's never been in the case. I called him, I talked to him, and he seems to have never actually sent an email. That's right. That's right. That's right. They never, they never came to us. So we're waiting on that to come back. Because at the end of the day, he was at home there. Is there anything you need to be certain of this case? And if there is, do you need to provide a number of questions? Is there anything you need to be acceptable? Yes. It's the body. The body's very important. Right. Other than that, that's what the record is. There was never any communication from the supplier to the state. There was no security for them. And there was never a position to take their attention. And if there is, what is that? Counselor, I'm very concerned about the refusal to participate in the investigation. What will the record tell us as to whether or not your client simply refused to participate in the case in terms of property injury or what you were doing, you said? Yeah, we were trying to reschedule. Well, there's the November 30th of 2009. We're in ER 324. I'm a person. We were fine. We wanted to do it. I am a person. We asked you to reschedule to the 4th of June 2014. That is correct. The reason we're here is. Okay. I'm curious. For example, what did you say about the medical assessment and the audit of the case? Well, the medical assessment, we had a long-term case in the community. And as far as the case, she's been diagnosed with this. She had no injuries. This, the CDC, and we have a report from our director, Charlottesville County, that the examination was in June, and everything was okay. And the basis for the refusal to participate in the investigation. That was the only basis for the error. Okay. And we have not suggested that it was, but it's not the basis stated in the record, is it? No, this is not the basis stated in the record. We also stated in the record, Your Honor, that we had a basis scheduled with the physicians on September 31st, September 5th, at 11 a.m. to see whether or not it was still in danger. Okay. And I don't know if that's a good excuse, but that's a good excuse. If you look at December 7th, it might matter, December 7th, January 3rd, February 9th. This states three or four times in that letter, please rescind it, please rescind it, Your Honor.  It is the evidence for the refusal to participate in the investigation. But Your Honor, I don't think that we rescheduled it so fast. I mean, January 5th, December 7th, July, there's still danger in the correspondence. I don't think we rescheduled it. Yes, there was an hour scheduled on September 31st, in fact, please. Well, I think you just said January 5th, not 4th. We just changed it up a little bit. Yes, Your Honor. Because there's a July and October. Yes, Your Honor. So, I think it's the July, and then next spring, and then July, and October, and then the correspondence that we have on the record, on January 7th,  So, I think it's the July and December.    Your Honor. So, it's not January, it's the July and December, so I think that we're in the middle of January. It's January 5th, December 30th, Your Honor. Yes, Your Honor. And then in early January, who's going to meet with Dr. Elkins to go over the results? Your Honor. Well, because I'm not going to be in the courtroom, there's somebody who is. And, to be on December 2009, I was briefed as to how we can conclude this treaty, as to how we can conclude the unreasonable, unnecessary, inconveniently, scantily, unadmitted, neuropsychological evaluation of the European Union. Your Honor. Very good. Yes, Your Honor. No,  no, Your Honor. Your Honor, you, . Please hold on one minute.
judges: Farris, O'scannlain, Christen